**ESSEX MUSIC, INC., Plaintiff,**

v.

**ABKCO MUSIC AND RECORDS, INC.,** doing business as Abkco Records, a division thereof, and Allen B. Klein, Defendants.

**No. 90 CIV 1768 (LBS).**

United States District Court, S.D. New York.

Aug. 1, 1990.

238

Abeles Clark and Osterberg, New York City (Robert C. Osterberg, of counsel), for plaintiff.

Pryor, Cashman, Sherman & Flynn, New York City (Donald S. Zakarin, Tina C. Kremenezky, of counsel), for defendants.

## OPINION

SAND, District Judge.

A company claiming to be the licensee of exclusive rights under the copyright to a popular song sues a company claiming to be the owner of the copyright for copyright infringement and violations of the Lanham Act. The alleged licensee moves to strike four of the alleged owner's affirmative defenses, for summary judgment as to liability on the copyright claims, and for a permanent injunction, or in the alternative, a preliminary injunction.

### Background

Some time prior to September 1, 1964, Mick Jagger and Keith Richards, both members of the group the Rolling Stones, and their manager, Andrew Loog Oldham, composed a song entitled "As Tears Go By" ("the song") and assigned the copyrights in the song to Forward Music, Ltd. ("Forward"), a British music publisher. Plaintiff's Rule 3(g) Statement ¶¶ 1–2;

Klein Affidavit in Opposition to Motion to Strike Defense ("Klein I") ¶ 2; Oldham Affidavit ¶ 1. By written agreement dated September 1, 1964 ("the 1964 agreement"), Forward granted plaintiff Essex Music, Inc. certain exclusive rights under the copyright to use and license the use of the song in printed and recorded copies in the United States, Canada, Australia and New Zealand. Plaintiff's Exhibit 1. In an attached "Territorial Schedule Supplement," Forward and plaintiff agreed to "assign the agreement" to Essex Music of Australia Pty. Ltd. for the territory of Australia and New Zealand. Pursuant to the agreement, plaintiff was to pay a percentage of the earnings from the use and licensing of the song to Forward at an address in London. The agreement was recorded in the United States Copyright Office on September 3, 1964. Plaintiff's Exhibits 2 & 10.

Defendant Klein, presently the President of defendant ABKCO Music and Records, Inc. ("ABKCO"), affirms that he represented the Rolling Stones and their manager in conducting a review of their various contractual arrangements in the spring of 1965, and that upon reaching twenty-one years of age, the members of the group and their manager "disaffirmed" various exclusive agreements related to their songwriting activities. Klein Affidavit in Opposition to Motion for Summary Judgment ("Klein II") ¶ 17. According to Klein, this disaffirmance "impacted directly on certain arrangements" between the group and a company called Essex Music, Limited ("Limited") and the "Essex Group territorial affiliates." *Id.* The parties dispute whether plaintiff and Limited are "affiliated" or at least jointly controlled.

Klein further affirms that negotiations were conducted from the summer of 1965 until the fall of 1966 and led eventually to other agreements. *Id.* By agreement dated November 1, 1966 ("the 1966 agreement"), Gideon Music, Inc. ("Gideon"), an affiliate of Forward, purported to grant to Limited exclusive sub-publication rights for the entire world, except the United States, Canada and the British Isles, to all the musical compositions which Gideon owned or for which it had exclusive sub-publication rights, including those owned or controlled by Forward. Plaintiff's Exhibit 8 ¶¶ 1, 4, 12(a) & (b).[1] Defendants contend that the song was within the scope of the agreement, that the agreement was intended to supersede the 1964 agreement, and that Gideon was to retain rights to the song in excluded territories. Plaintiff, for its part, offers a variety of explanations for why the 1966 agreement did not supersede the earlier agreement and why plaintiff retained the rights to the song for the United States and Canada.

In 1968, Limited assigned its rights under the 1966 agreement to its affiliate, Essex Music, International, which apparently later became Westminster Music, Ltd. Klein II ¶ 21; *see infra* p. 243. In or about 1970, through various corporate transactions involving a purchase of all of the stock of Forward and its subsequent liquidation, ABKCO became the owner of all of Forward's assets, including the copyright to the song. Klein I ¶ 3; Oldham Affidavit ¶ 2. In July 1975, ABKCO obtained a license under the compulsory license provisions of the Copyright Law through the Harry Fox Agency, which had been authorized to represent plaintiff in licensing rights to use the song and in collecting royalties, for use of the song in the United States. Plaintiff's Exhibit 3.

According to defendant Klein, towards the end of 1978 or early 1979 he learned that ABKCO had been paying mechanical royalties for the account of plaintiff to the Harry Fox Agency and that plaintiff was claiming sub-publication rights in the United States and Canada. Klein I ¶ 11. Klein reports that he then informed Howard Richmond, then the principal owner of plaintiff and its chief operating officer, that no such payments would be made in the future. *Id.* Howard Richmond offers a different version of the meeting, affirming that Klein actually sought an assign-

---

1. In a separate agreement also dated November 1, 1966, Gideon granted Limited similar rights for the British Isles. Defendants' Exhibit F.

ment of plaintiff's rights. Plaintiff's Exhibit 14 ¶ 5. It appears to be undisputed that since the period ending June 30, 1978, ABKCO has not accounted to or paid Essex for use of the song. *See* Klein I ¶ 12; Plaintiff's Exhibit 16. In September 1984, however, ABKCO once again secured a license under the compulsory license provisions of the Copyright Law to make and distribute a phonorecord in the United States. Plaintiff's Exhibit 3. At least since 1986, ABKCO has again been distributing phonorecords of the song, including some in the form of compact discs. Larry Richmond Affidavit ¶¶ 5–9; Klein II ¶ 12.

On February 9, 1990 plaintiff served on ABKCO written notice that the compulsory license to use the song would be terminated unless payment of all unpaid royalties and royalty statements for the phonorecords were submitted within thirty days. Plaintiff's Exhibit 5. Plaintiff commenced this action on March 15, 1990 asserting five claims against ABKCO and Klein, four for copyright infringement occurring after March 14, 1987 and one for violation of section 43(a) of the Lanham Act, 15 U.S.C. §§ 1121 & 1125(a).[2] Defendants, for their part, assert eight affirmative defenses and four counterclaims. Each of plaintiff's three motions will be considered separately below.

## *Discussion*

### I. *Motion to Strike*

▇▇▇ Plaintiff moves to strike four of defendants' affirmative defenses. Since plaintiff also moves for summary judgment and since defendants assert all of their affirmative defenses in opposition to summary judgment, we need not consider defendants' argument that a motion to strike is not the appropriate procedural vehicle through which to resolve the issues raised by the affirmative defenses. We do note, however, that a "motion to strike for insufficiency was never intended to furnish an opportunity for the determination of disputed and substantial questions of law."

*William Z. Salcer, Panfeld, Edelman v. Envicon Equities Corp.*, 744 F.2d 935, 939 (2d Cir.1984) (quoting *Carter–Wallace, Inc. v. Riverton Laboratories, Inc.*, 47 F.R.D. 366, 367 (S.D.N.Y.1969)), *vacated on other grounds*, 478 U.S. 1015, 106 S.Ct. 3324, 92 L.Ed.2d 731 (1986). Such motions will be granted, however, when "it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense." *Id.* (quoting *Durham Indus., Inc. v. North River Ins. Co.*, 482 F.Supp. 910, 913 (S.D. N.Y.1979)).

▇▇ In their first two affirmative defenses, defendants assert that plaintiff has no standing to bring any action for infringement of the copyright at issue in this case and that even if plaintiff has standing, it cannot sue the owner of the copyright. As a threshold matter, the Court must determine whether to apply the Copyright Act of 1909 or the Copyright Act of 1978.

Issues relating to plaintiff's standing should not be resolved according to the law at the time of the 1964 agreement, as defendants contend, but rather according to the provisions of the 1978 Act. As Nimmer has observed, under a proper construction of the relevant sections of the 1978 Act:

[when] a beneficial owner's standing to sue differs as between the 1909 Act and the current Act, the current Act should be applied as to causes of action arising after January 1, 1978, even if the instrument creating such beneficial interest was executed pre–1978.

3 Nimmer on Copyright § 12.02 at 12–32 n. 20.1 (1990). *But see Cortner v. Israel*, 568 F.Supp. 1217, 1218 n. 3 (S.D.N.Y.1983) (applying 1909 Act to determine whether beneficial owner had standing), *aff'd on different grounds*, 732 F.2d 267 (2d Cir.1984) (expressly declining to reach issue). There is no reason to believe that issues relating to the standing of an exclusive licensee

---

**2.** None of the parties address plaintiff's Lanham Act claim with regard to any of the motions now pending before the Court, though defendants appear to be under the mistaken impression that this Court could dismiss this action sue sponte for lack of subject matter jurisdiction without considering the Lanham Act claim.

should be decided any differently. Indeed, it is quite clear that:

> any rights or remedies under the 1909 Copyright Act are superseded by the rights and remedies under the current Copyright Act with respect to causes of action arising on or after January 1, 1978. This is true even as regards works which first became the subject of copyright pre–1978 under the 1909 Act.

Nimmer, *supra*, § 101[B][4] at 1–29 (construing 17 U.S.C., Trans.Supp.Prov. § 112).

In *Roth v. Pritikin*, 710 F.2d 934, 938 (2d Cir.1983), *cert. denied*, 464 U.S. 961, 104 S.Ct. 394, 78 L.Ed.2d 337 (1983), the case cited by defendants, the Second Circuit found that:

> Whoever holds an interest in a copyright on or after January 1, 1978, has a right to the protections afforded by the [1978 Act], although the creative work may previously have been governed by the 1909 Act or the common law. Section 301 [of the 1978 Act [3]] does not, however, purport to determine who holds a copyright for works created before January 1978. It merely clarifies the rights of individuals owning copyrights on that date, whomever they may be.[4]

With respect to their first two affirmative defenses, defendants argue that plaintiff, the purported exclusive licensee, does not have standing, but they do not dispute that plaintiff acquired an interest in the copyright as a result of the 1964 agreement. Indeed, the plain language of the agreement establishes that defendant's predecessor in interest simply contracted to grant certain exclusive rights. *See* Plaintiff's Exhibit 1. Thus, what these affirmative defenses contest are the rights of the exclusive licensee, not who holds interests in the copyright. It is also apparent that there is nothing in the agreement which remotely suggests that Forward contracted specifically to retain the exclusive right to sue for infringement.

■ Plaintiff as an exclusive licensee has the right to institute an action for copyright infringement. Under the 1978 Act, the owner of "any one of the exclusive rights comprised in a copyright" is the "copyright owner," 17 U.S.C. § 101, and such owner "is entitled ... to institute an action for any infringement of that particular right committed while he or she is the owner of it." *Id.* § 501(b).[5] The legislative history of the Act describes these provisions as meaning that "any of the exclusive rights that go to make up a copyright ... can be transferred and owned separately.... It is thus clear, for example, that a local broadcasting station holding an exclusive license to transmit a particular work ... could sue, in its own name as copyright owner, someone who infringed that particular exclusive right." H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. at 123 (1977), U.S.Code Cong. & Admin.News 1976, 5659, 5739. Defendants' first affirmative defense—that plaintiff lacks standing to sue for infringement—is stricken.

There is similarly no merit to defendants claim that defendant ABKCO, as the copyright owner, cannot infringe its own copy-

---

**3.** Section 301 provides in relevant part:

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title.

17 U.S.C. § 301(a).

**4.** *See also* 1 P. Goldstein, Copyright § 4.4 at 407 (1989) (1909 Act governs "validity and effect of

transfers" of copyright executed before January 1, 1978).

**5.** Even under the 1909 Act, an exclusive licensee could sue for infringement if it joined the copyright owner as a party. *Cable Vision, Inc. v. KUTV, Inc.*, 335 F.2d 348, 334 (9th Cir.), *cert. denied*, 379 U.S. 989 (1964); *First Fin. Mktg. Servs. Group, Inc. v. Field Promotions, Inc.*, 286 F.Supp. 295, 298–99 (S.D.N.Y.1968); *Field v. True Comics, Inc.*, 89 F.Supp. 611, 613 (S.D.N.Y. 1950); *Hoffman v. Santly–Joy, Inc.*, 51 F.Supp. 779, 780 (S.D.N.Y.1943). The authorities cited by defendants do not support their assertion that before the 1978 Act, exclusive licensees could only sue for infringement if they were granted that right by contract.

right. "[A] licensor may be liable to the exclusive licensee for copyright infringement if the licensor exercises rights which have theretofore been exclusively licensed." *Nimmer, supra,* § 12.02 at 12–29. *See Dodd, Mead & Co., Inc. v. Lilienthal,* 495 F.Supp. 135, 137 (S.D.N.Y.1981); *Hal Roach Studios, Inc. v. Richard Feiner & Co. Inc.,* 1984 Copyright Law Decisions (CCH) ¶ 25,709 (S.D.N.Y.1984); *Fantasy, Inc. v. Fogerty,* 654 F.Supp. 1129, 1132 (N.D.Cal.1987); *see also SBK Catalogue Partnership v. Orion Pictures Corp.,* 723 F.Supp. 1053, 1062 (D.N.J.1989). In *Fantasy v. Fogerty,* the composer of a song, who had granted exclusive rights in the copyright to the song to the plaintiff's predecessor in interest in return for a sales percentage and other royalties, authorized the distribution of copies of an allegedly identical song. The composer, like ABKCO, argued that his interest in the copyright immunized him from an infringement suit. The Court articulated the general principle that "[a] copyright owner can infringe upon any exclusive right which he transfers or grants to another," and held that since the composer had "no independent right to use or license the copyright" to the song, he had infringed upon the licensee's exclusive rights. *Id.* at 1130.

Defendants seek to distinguish *Fantasy v. Fogerty* by pointing out that the composer transferred the entirety of his interest in the copyright and then created a derivative work which was in direct competition with plaintiff's work. As Nimmer and the *Fogerty* Court point out, however, the 1978 Act is concerned with the transfer not only of entire copyrights but also of specific "rights" under the copyrights; indeed, "[o]nce the copyright owner grants an exclusive license of *particular rights,* only the exclusive licensee and not his grantor may sue for later occurring infringements of *such rights.*" Nimmer, *supra,* § 12.02 at 12–29 & n. 13 (emphasis added). ABKCO is not alleged to have infringed its own rights, as defendants suggest, because it has allegedly transferred the specific rights which it now exercises. That the infringement in *Fogerty* consisted of the creation of a derivative work, rather than

the non-payment of royalties, was hardly significant to the Court's decision and did not contribute in any way to the rationale for its holding. As we determine in the next paragraph, it is beyond dispute that non-payment of royalties can constitute copyright infringement. Defendants' second affirmative defense—that as the owner of the copyright it is not subject to suit—is therefore stricken.

■ Defendants' third affirmative defense—that the failure to pay royalties is a breach of contract and does not constitute a basis for a copyright infringement—is wholly without merit. Under the 1978 Act, a copyright owner who has not received payment may terminate a compulsory license upon thirty day notice, after which "the making or the distribution, or both, of all *phonorecords for which the royalty has not been paid* [is] actionable as acts of infringement …" 17 U.S.C. § 115(c)(5). *See also Shapiro, Bernstein & Co. v. Gabor,* 266 F.Supp. 613, 614 (S.D.N.Y.1966) (non-payment of royalties actionable under 1909 Act). Defendants' third affirmative defense is stricken.

As a seventh affirmative defense and third counterclaim, defendants contend that they are entitled to an accounting of the monies derived by plaintiff under the copyright and to payment of their contractual share of the money. Until such time as it is determined which agreement controls the rights and liabilities of the parties, we decline to decide this issue. *See infra* pp. 243–244. Plaintiff's motion to strike this affirmative defense is therefore denied.

## II. *Summary Judgment Motion*

Before any discovery has taken place, plaintiff seeks summary judgment as to liability on its copyright claims. In response, defendant asserts a series of affirmative defenses, including those discussed above. Because we find that defendants' Sixth Affirmative Defense—that the 1966 agreement superseded the 1964 agreement—raises genuine issues of fact, plaintiff's motion is denied.

Fed.R.Civ.P. 56(c) stipulates that a motion for summary judgment is to be granted if there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The Court should not "resolve disputed issues of fact" but should "assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). At the same time, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

■ By the terms of the 1966 agreement, Gideon, an affiliate of Forward, purported to grant to Limited exclusive sub-publication rights for the entire world, except the United States, Canada and the British Isles, to all the musical compositions which Gideon owned or for which it had exclusive sub-publication rights, including those owned or controlled by Forward. Plaintiff's Exhibit 8 ¶¶ 1, 4, 12(a) & (b). While defendants contend that this agreement was intended "by the parties" to supersede the 1964 agreement and that Gideon was to retain sub-publication rights in the United States and Canada, *see* Klein I ¶ 10; Klein II ¶ 17; Oldham Affidavit ¶ 6, plaintiff argues that the two agreements are not inconsistent, that plaintiff was not a party to the second agreement, and that ABKCO's conduct since 1966 has been consistent with the 1964 agreement.

It is apparent from the express terms of the 1966 agreement that it is inconsistent with the 1964 agreement. The song at issue in this case was quite clearly one of the songs conveyed by Gideon in the 1966 agreement and at least some of the rights conveyed had also been conveyed in the 1964 agreement. In the 1966 agreement, Gideon purported to convey all the songs for which it owned exclusive sub-publication rights and "warranted and represented" that it or its affiliates owned sub-publication rights in "all of the musical compositions heretofore written by Keith Richards and Mick Jagger ... jointly, alone and/or in collaboration with third-party writers," except those owned by a company called Southern Music. *Id.* ¶¶ 12(a) & (b).[6] Though the rights conveyed were confined to a territory excluding the United States, Britain and Canada, Gideon's representation concerning ownership did not appear to be limited to any geographic boundaries. Moreover, the 1966 agreement purported to convey rights to the song for Australia and New Zealand, rights which plaintiff was supposed to have acquired in the 1964 agreement and then assigned to another company. Finally, the agreement makes no mention of any subpublishing rights to any of the songs held by anyone else, with the express exception of Southern Music, and states that "it is expressly understood that Essex may publish, sell and license the use of the said composition in the [defined territory] only." *Id.* ¶ 13(d).

There is sufficient doubt about plaintiff's association with Limited, the signatory to the 1966 agreement, for a reasonable factfinder to conclude that the relevant parties intended the 1966 agreement to supersede the 1964 agreement. Though plaintiff represents that Essex Music, Limited "is a totally separate company" from plaintiff Essex Music, Inc., it does concede that they have some "interlocking ownership." Transcript of Oral Argument dated May 31, 1990 at 13.[7] Moreover, in responding to defendants' claim that plaintiff has not fulfilled its own obligations to account under the 1964 agreement, plaintiff protests that payments have indeed been forwarded, but it indicates that the payments have been forwarded through a company called Westminster Music, Ltd. *Id.* at 39; Larry Richmond Reply Affidavit ¶ 4. It appears that Westminster *is* affiliated with Limited and

---

6. Though a list of songs was appended to the 1966 agreement which did not include the song at issue in this case, the agreement itself described the list as "partial." Plaintiff's Exhibit 8 ¶ 1 & Schedule "A".

7. Defendant Klein affirms that he believes that the Richmond family owns and controls 90% of Limited and 50% of Westminster (Essex International). Klein II ¶ 18.

is the assignee of Limited's rights under the 1966 agreement. Defendants' Memorandum in Opposition to Motions for Summary Judgment and a Preliminary Injunction at 7, 43; Klein II ¶ 18. At the very least, one could infer from these facts a measure of joint control and the disregard of corporate identities.

Far from resolving the matter, the conduct of the parties after 1966 raises factual issues. Plaintiff points out that: the United States Copyright Office records, the Harry Fox Agency Inc. records, and the performing rights society (ASCAP) records all show plaintiff as the owner of exclusive rights for this country and Canada; that ABKCO submitted royalty reports and payments to plaintiff from 1969 to 1977; that ABKCO received licenses from plaintiff through the Harry Fox Agency in 1971, 1975 and 1984; that ABKCO's reprint of the song's lyric on CD identifies plaintiff as owning a copyright interest in the song; and that ABKCO submitted to four audits between 1971 and 1979 conducted on behalf of plaintiff. Larry Richmond Reply Affidavit ¶ 6.

At the same time, defendants point out that: plaintiff, or its affiliates, has exercised rights to sub-publish outside the territories discussed in the 1964 agreement, rights which it could only have received through the 1966 agreement; that plaintiff waited a full twelve years after ABKCO ceased payment before suing for infringement; and that the only payments made pursuant to either agreement were apparently made by an entity affiliated with the signatory to the 1966 agreement which was also the assignee of the signatory's rights under that agreement. Defendants' Memorandum in Opposition to Motion for Summary Judgment at 6; Klein II ¶ 16. Klein, for his part, affirms that until the end of 1978 he had "absolutely no idea that Essex was purporting to claim subpublication rights in the [song] in USA and Canada" or that his company was paying plaintiff. Klein I ¶ 11; Klein II ¶ 22; Salinsky Affidavit ¶ 6. While defendants may simply be taking advantage of inartful wording in the 1966 agreement and the peculiar circumstances of this case, the Court believes that the issues raised cannot be resolved on a motion for summary judgment.

### III. *Motion for Preliminary Injunction*

Plaintiff also moves for a preliminary injunction. In order to be entitled to such relief, the plaintiff must establish that the injunction is necessary to prevent irreparable harm and either (i) that he is likely to prevail on the merits of the case or (ii) there exist sufficiently serious questions going to the merits as to make them a fair ground for litigation together with a balance of hardships tipping decidedly toward the movant. *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985). Since plaintiff has not demonstrated that it will suffer irreparable harm without such relief, its motion is denied.

■ While "irreparable harm may ordinarily be presumed from copyright infringement," *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.,* 780 F.2d 189, 192 (2d Cir.1985), "significant delay in seeking a preliminary injunction may be sufficient basis for vitiating such an assumption and denying preliminary relief." *Business Trends Analysts v. Freedonia Group, Inc.,* 650 F.Supp. 1452, 1459–60 (S.D.N.Y. 1987), *aff'd in part, rev'd in part,* 887 F.2d 399 (2d Cir.1989); *see Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir.1985) ("[s]ignificant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement"); *see also Majorica, S.A. v. R.H. Macy & Co., Inc.,* 762 F.2d 7, 8 (2d Cir.1985). In *Hasbro,* Judge Weinfeld declined to issue a preliminary injunction in a copyright infringement case in part because the plaintiff had delayed seeking such relief for over six months after learning of the conduct allegedly constituting infringement. In *Citibank,* the Second Circuit found that a ten week delay in seeking an injunction against trademark infringement "undercut[ ] the sense of urgency that ordinarily accompanies a motion for preliminary relief and

suggest[ed] that there [was], in fact, no irreparable injury." 756 F.2d at 277 (quoting *Le Sportsac, Inc. v. Dockside Research, Inc.,* 478 F.Supp. 602, 609 (S.D.N.Y. 1979)).

■ In this case, ABKCO ceased paying or rendering royalty statements to plaintiff for royalty accounting periods starting September 30, 1978. Plaintiff commenced this action on March 15, 1990, and eleven weeks later, filed a motion for a preliminary injunction. It goes almost without saying that these delays seriously undermine plaintiff's argument that it is suffering irreparable harm. Though plaintiff attempts to argue that ABKCO's failure to pay or render royalty statements would not by itself have signaled the existence of an adverse claim, *see* Brackman Affidavit ¶ 3, 4, it is entirely unpersuasive to suggest that the complete absence of any such statements over nearly twelve years would not have alerted plaintiff to at least the possibility of such a claim. From ABKCO's application for a license through the Harry Fox Agency in 1984 and the various audits of ABKCO conducted by Fox, plaintiff must have learned of defendants' phonorecord distribution. Indeed, Klein reports that ABKCO heavily advertised the release of phonorecords of the song in the consumer press, the trade press and on the radio between 1986 and 1989. Klein I ¶ 12.

### Conclusion

For the reasons stated above, plaintiff's motion to strike defendants' affirmative defenses is granted with respect to the first three affirmative defenses, but denied with respect to the seventh affirmative defense and third counterclaim. Plaintiff's motions for summary judgment and for a preliminary injunction are denied. The parties are to provide a letter indicating the status of this case by September 18, 1990.

SO ORDERED.